Good morning. May it please the Court. I am Arnold Phillips, representing Craig Chapman, the appellant. Your Honor, this case poses hazards to individual liberty of dramatic proportions. The issue is, to what extent is the privilege and the exception to the rule providing relief to an individual citizen for defamation to be extended? If we follow this case, we have actually extinguished the privilege and the exception, and the exception has become the rule. That follows from the Court's determination granting to Mr. Chapman the general purpose public figure status. The Court went through its analysis. We have reviewed and criticized our analysis of that. It's very interesting because in the 40s and 50s and 60s, before Time's V. Sullivan, this article would have been considered, in my opinion, a hatchet job. If we were here discussing pornography, this piece would have no redeeming social value. It is not for the purpose of any public issue, Your Honor. It is only for the purpose of disparaging Mr. Chapman. Let me ask you about that. I think, as you point out, this question of your client as a public figure is a very interesting and difficult legal question. It seemed to me that in the end, neither the judge nor the jury had to get to that question. If the statements were true and there wasn't any actual defamation, then you wouldn't need to determine the intent with which they were made. I'm wondering if you might focus on that, because we have two statements that went to the jury, and then the judge also had knocked out some in advance. It would be helpful to me, because I think, in some ways, the case rises and falls first on that issue, and then you have to get to the next issue. The landscape of the litigation was changed by the decision that the judge made granting the privileged status to Mr. Chapman, because it changed the standard from negligence to actual malice. It also took out defendants and causes of action. Had we been proceeding with those defendants and those causes of action, we would have been able to put more evidence in front of the jury of the actions of the publisher. Let me just be specific. I'm looking at the verdict form, and they talk about the first question. The first question is falsity, Your Honor. The first question is falsity about Jeff Johnson's quotation about your client. How would that have changed? Your Honor, it wouldn't have changed. It wouldn't have changed. It would have probably been the same question. But how would the evidence? I guess Judge Rollins and I are kind of responding to your statement that you would have had maybe different defendants and different evidence. Well, for instance, we would have had in the photographer, would have stayed in the case. The photographer came and took pictures of Mr. Chapman's surfing, his shaping room, saying that he was just doing it because he was casually interested in it. He was doing it under directions of the publisher to go out and get some pictures of this room. All right? So we would have had possibly a misappropriation, maybe other torts there. That information would have been in front of the jury. We would have been able to get into some of the investigation and lack of investigation, some of the violations of some of the journalistic practice standards. We would have had more ability to get... But wouldn't you, in fact, wouldn't you definitely have to do that anyway if you were going to go down the malice route? I mean, why would that change? Well, it changed because there were no longer defendants and the cause of action were no longer there because of the judge's ruling on that. So the photographer is one person. Right. The photographer is one person and the photographs. And the editor gave directions about the scurrilous and profane, go out and see if you can get some scurrilous and profane takes on this guy, that sort of thing. It also involved... You couldn't introduce that evidence? Your Honor, I believe that evidence got in, but the part of that email that didn't get in was the reference to the Burroughs. Okay. So that's a separate thing because Burroughs kind of is over here with the judge. It's a separate thing. Well, the judge made a decision on Burroughs, correct? The judge did make a decision on Burroughs. Okay. So why don't we just start with that. You disagree with that decision? I disagree with that decision, Your Honor, and the reason I disagree is you can't read the article. From the title of the article to the last paragraph of the article, a reasonable person could not understand that article without having information about who El Hombre is, Invisible, and the references to Old Bull Lee and these other references that are made throughout the article. In other words, that would have provided the opportunity for us to get into the comparisons, which the author has admitted he intended to draw between Mr. Chapman and Burroughs, and that would have gotten into all of this pedophilia and all of this drug involvement and escaping the country. The comparisons would have provided a better picture. The comparisons the author drew between the Burroughs article and Mr. Chapman would have provided for the jury a better context, an underwriter, an entire context to view what this publication was about. If you take out that from the start, you don't quite understand what this is about. Now, the court said, well, this is about a board transaction, and the plaintiff says that he was never in town during this period of time, which the author says this whole transaction took place. You know, the article- Well, you were able to present that evidence, correct? We were. To say, look, this is false because you're saying that this whole board transaction or non-transaction took place, but I'm telling you my client wasn't even around to have it happen. Well- So I'm not sure how the judge's malice decision, I'm trying to figure out how that possibly affected your ability to put on that testimony. Okay, I'm not quite sure I follow you. Well, I mean, maybe that's because I'm not following you. You're telling me that this decision on Burroughs and this decision on malice somehow changed your whole trial. I'm trying to figure out, well, what does that mean? What that means, Your Honor, is that we are limited from presenting the picture of the article in its context, the entire article, all of the disparaging innuendos which it makes about Mr. Chapman, beginning with the first situation where he's lurking, he's compared to picking up this kid in the parking lot. Now, where would that come from and how would that make any difference without being able to place that in connection with the title and talk about Mr. Burroughs' conduct in his life? So when we were taken, that was taken away from us. For instance, I'll give you another example. When we had this issue come up about the drugs. Now, the drugs issue, the comment was sober, which I think the general understanding is sober has to do with alcohol and alcohol abuse. The Thursday before the trial, at a motion in limine, the defendants left the courtroom, called Mr. Pesman, and Mr. Pesman said he meant heroin. So up until that point, any of the heroin, any of the drug information would also have been information which was raised by the defendants in their references to Mr. Burroughs and his heroin addiction and his heroin-related conduct. So we didn't have that. We didn't have the comparison with Burroughs. We weren't able to get into the mindset of the publisher. There was one instance, Your Honor, where we had another, it's the Hackman situation, where it's another article by Mr. Pesman about another surfer that involves heroin, and I wanted to question Mr. Pesman about how he handled that so differently. In that case, he sat down with Mr. Hackman and his representatives, and they discussed how they were going to do it, and the editor of the book he was writing, and everybody was involved. And they handled it in a very sensible, reasonable way, as opposed to what happened in this case, where we have this comment that comes out of the liner note that just sort of drops in there like a bomb. But I didn't have that. So what was there that I had to show actual malice, to show the mindset of the publisher, to establish the actual malice? I mean, I lost that opportunity. I couldn't get into and had to respond to the heroin statements that Mr. Pesman made. I mean, it was, I actually think, Your Honor, I think about it a lot, and I think that because in the opening statement, we said that we were going to bring in the almost statement. We were going to bring in the tape. The fact that this tape couldn't possibly, unless Mr. Baxter was incorrect in calculating the age of his son, was not made until after the article, which would help us in the malice. And so, I'm sorry, I lost my point there. Without any of those, without any of those, we were, the jury was just exhausted. I think that's the only reason in my mind that I think they answered this question. They had seen so much taken away from the plaintiff during the trial, that even though they'd heard Mr. Pesman testify that he made the statement, it was false, he said it, Mr. Baxter didn't say it, that they just said, you know, they were, I think they felt directed in a sense, not consciously, but unconsciously, by the way this had proceeded to make that determination about the falsity of the statement. Because it's clear from the record, Your Honor, it's clear from Mr. Pesman's own testimony, that that statement was a fabricated statement that he made up, and those words he placed in Mr. Fletcher's mouth as if Mr. Fletcher made the statement. So, do you want to save your two minutes? Yes, Your Honor, thank you very much. Good morning, may it please the court, Elijah Yip along with Jeffrey Portnoy for the appellees. Like many defamation cases, this is a case that originates with bruised egos, and in the surfing world, egos are not common. Surfing personalities have a colorful history, and sometimes their egos lead to scuffles, and usually those scuffles get resolved on the beach, but in this case, it's gone into the courtroom, and not just that, but to the point of a seven day jury trial. But at the core of this case is about Mr. Chapman trying to protect his legend and his ego. And Mr. Chapman believes that for whatever reason, that a good natured, good humored article about him actually attacks him, and because he feels that threat, he's made some outrageous allegations. Well, it's not all that good humored when you accuse somebody of drug use and cutting in and surfing and not delivering the boards on time. I wouldn't call that like a puff piece. Your Honor, that's a point well taken, but that has to be taken in the context of the surfing community. Attributes which other communities might view as perhaps not favorable in the surfing community adds character to the persona, in this case, the persona of Mr. Chapman. So these characteristics in the article were not meant to demean him, but rather to add to the flavor that was there already. But what about this, the one statement that went to the jury, I heard he's been sober for the last year. The person being interviewed didn't make that statement, right? The interviewer made it? He did not actually make that particular statement, but the gist of that statement he agreed with. What that passage represented was an exchange between the interviewer, Steve Kessler. Who made that statement? Who made that statement. And then he says, one year out of 40. Correct. Correct. And again, the context of that statement, again, was not to say, well, here's a bad person. He's been on drugs for 40 years. It was actually a, it was a complimentary one. It was more along the lines of, well, he's finally sober. That's a good thing. If it was a compliment, it certainly was a backhanded compliment. I would agree with that, Your Honor. I would agree with that. I would agree with that, definitely, Your Honor. Your Honor, I would like to address a couple of the points raised during the appellant's argument, if the court would indulge me. I completely agree with Judge McEwen's analytical framework regarding the public figure status. I think before we even get to that issue, we have to consider that the jury didn't have to consider the public figure status. The jury determined that the statements, disputed statements, were not false. That knocks out an element of the prima facie case. What do you do, though, with opposing counsel's representation that the evidence would have come in differently but for the district court's preliminary ruling that Mr. Chapman was a public figure?  First of all, in regards to the element of fault, and with the court's ruling would be actual malice, that actually raises the bar. The evidence that he would have had to present would have met a negligence standard. It should because it's a higher bar, not a lower one. Chapman has no excuse to say, well, I've been prevented from presenting evidence that would disallow me from proving my case. It's a higher standard. He had to meet it. If he wanted to meet it, he would have to present that kind of evidence. Moreover, again, the analytical framework here is important. He had to present evidence of falsity, and he tried doing that. The jury got the issue and determined that the statements were not false. That's an element that's distinct from the fault element. And so regardless of what kind of evidence he introduced about fault, the dispositive issue here is falsity. That's the jury verdict, that these statements were not false, the end of the story. We don't even get to fault. We don't need to. And that's very important because, Your Honor, I also want to point out that his claim, Mr. Chapman's counsel, represents to this court that because of the public figure ruling, certain cause of action and defendants were knocked out. I disagree with that. That's not the effect of the ruling. All the ruling did was impose a higher level of fault as to those defendants. And with regard to the cause of actions, they were dismissed on other grounds which were not on appeal before the court here. Would you address his comments about the Burroughs illusion? And as I understand it, he's saying if you don't put in this evidence about what the Burroughs illusion means, then you're not putting the article in context. And that, you know, this sort of wild and crazy drug crazed person of Mr. Burroughs and the world he lived in, literary and otherwise, that you need that for context. Otherwise, it disadvantages his client and that the district court shouldn't have excised that from the case. Sure. And the answer to that question is that counsel was not precluded from mentioning Burroughs going into some of the references at trial. He was not. In fact, counsel did ask the author, Jeff Johnson, questions about the Burroughs references. The court's ruling, in limine ruling, was not that all references to Burroughs per se are excluded. What he excluded were the literary works themselves. I mean, Mr. Chaffin's counsel wanted to introduce the entire body of literature authored by Mr. Burroughs and make that part of the trial. That would have been a circus, Your Honor. The district court was acting completely within its discretion to exclude that type of evidence. I'll point the court to a couple of points in the record where Mr. Johnson was asked to explain references like El Hombre Invisible or Naked Lunch or some of the titles referenced in the article. Excerpt of Record Volume 1 at 61, that's an exchange where counsel for Mr. Chaffin asked Mr. Johnson, what do these references mean? So there was an opportunity to generally ask about these references, and by doing that, for the jury to get a flavor of the context. But what counsel wanted to do was to take the extra step now of importing all these references, all these allusions, all these literary works written by Mr. Burroughs and make that part of the trial. And the trial could have gone on for days. So that was completely an appropriate act of discretion by the district court to exclude that evidence. There's also a similar correct exercise of discretion as to the drugs issue. Now, Mr. Phillips makes a reference to an article about Hackman. And this was an article that Mr. Pesman had authored in years past. The reason that article was excluded was because it was a completely new exhibit offered on the third day of trial, I believe. We had not given any notice previous to that that counsel would use that piece of that article. And so, again, the court rightfully excluded that article. I would note, though, that there were references at trial to the heroin use. It was not as if counsel was precluded from going into the drug references. So there was evidence of that. And, again, based on the evidence presented, the jury decided the statements were substantially true. And so, Your Honor, if we look at the analytical framework here, the jury ruled on the one dispositive issue, falsity. And it determined that the statements were not false, did not need to get to the public figure, the false issue. And that disposed of the case. I just want to touch briefly on the post-trial motions because I think that procedurally they're also barred. With respect to the Rule 50B motion, a renewed motion for judgment as a matter of law, there was no Rule 50A motion. There was no motion for judgment as a matter of law made by Mr. Chapman before submission of the case to the jury. So, obviously, there cannot be a renewed motion. So that's barred. And, finally, as with respect to the new trial, the standard there is exceptionally high. The evidence has to be against the great weight of the jury verdict. And I think the record is very clear that there was evidence to support the jury's verdict. And so there were no grounds for a new trial being granted to Mr. Chapman. And unless the Court has any further questions, we urge an affirmance. Thank you. Thank you. You have some rebuttal time. Your Honor, just let me respond to a couple of the points made. We have the background, and it's in the liner notes. And it starts with Mr. Pesman and Mr. Chapman's relationship when he was 16 years old in Huntington Beach, California. And he was the younger brother of a Gary Chapman, who was another. And they mixed it up. They were not good friends. I guess Mr. Pesman's name was Honeybear, and he ran a sherf shop. And they named Mr. Chapman after his eyeglasses. For some reason, this animosity has continued. If you take all of the articles that the defendants have submitted that mention Mr. Chapman, there's only one article that is not either by Pesman or by an organization that he was operating, either by his own company. So I don't know what it was, but this and that went on until the late 1988, 1989. And then there was this quiet period. And I think it's very important that the court look at the Finnegan article, which was in the New Yorker magazine, which the defendants point to as showing that Mr. Chapman is a public figure, because he obviously has access to the media, because he just got into the New Yorker magazine in 2006. Actually, that's a very interesting article, because it's not an article about surfing, about surfing culture, per se. It's an article about the demise of a company that supplied the material that they made the surfboards out of. And it says that Mr. Chapman at that time was – the last time I saw Chapman was in 1997 in a ramshackle shed in the jungle in the north shore of Oahu. He was pretty much living board to board. It doesn't sound like a public figure to me. The privilege and the exception that the publisher has provided is if there's something that he's publishing that has a public interest to it. And there is nothing in this article that's of public interest. And thank you for the court's time. Thank you. Thank both counsel for this argument this morning. The case of Chapman v. Journal Concepts is submitted. We'll take a five-minute break. And counsel for United States v. Acuna v. Valenzuela, Olguin, and Ogana can get yourselves arranged. All rise. This court shall stand and recess. All right. Thank you.
judges: Hawkins, McKeown, Rawlinson